UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

NATIONAL SURETY CORPORATION                                                    PLAINTIFF

v.                                                                          CIVIL ACTION NO. 3:05-CV-119-S

HARTFORD CASUALTY INSURANCE COMPANY                                            DEFENDANT

**MEMORANDUM OPINION**

This matter is before the court on the motion to dismiss by the defendant, the Hartford Casualty Insurance Company ("Hartford"). This case involves the plaintiff's claims for breach of contract and for common law bad faith, under theories of conventional and equitable subrogation. For the reasons set forth below, the court will **GRANT** the defendant's motion to dismiss.

FACTS

Hartford insured Sufix, USA ("Sufix"), a company that manufactured a trimmer head for weed eaters. The plaintiff, National Surety Corporation ("National Surety"), was Sufix's excess carrier. A consumer who suffered an injury while using the weed eater filed suit against Sufix for defective design. The jury awarded the consumer $5,783,815 in damages. Hartford provided the legal defense for Sufix during the trial. Hartford, the primary insurer, paid its $1,000,000 policy limit, leaving National Surety to satisfy the remainder of the judgment. National Surety assumed the legal defense at this point and unsuccessfully appealed the verdict. It then paid the balance of the judgment, including interest. National Surety now seeks reimbursement from Hartford.

National Surety has asserted two claims against Hartford. First, it alleges that Hartford breached its contract with National Surety by failing to perform an adequate investigation, provide competent

1

defense and settle within policy limits. Second, National Surety alleges that Hartford breached its common law duty of good faith owed to Sufix. National Surety asserts both claims as Sufix's subrogee. Hartford has now filed a motion to dismiss all claims against it, arguing that Kentucky law does not recognize an excess carrier's right to proceed against a primary insurer via subrogation.

## DISCUSSION

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir. 2002). The court should grant the motion to dismiss the complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

The parties agree that Kentucky case law does not address the specific question presented at bar; namely, whether an excess carrier, as subrogee to its insured, can assert breach of contract and common law bad faith claims against the insured's primary carrier. Regarding such issues of first impression, we are charged with making the "best prediction, even in the absence of direct state court precedent, of what the Kentucky Supreme Court would do if it were confronted with th[e] question." *Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000) (citation omitted).

### A. Equitable Subrogation

While the Kentucky Supreme Court has not spoken on the precise issue at bar, the Kentucky Court of Appeals refused to recognize the theory of equitable subrogation in a similar situation. *See American Continental Ins. Co. v. Weber & Rose,* 997 S.W.2d 12 (Ky. 1998). The underlying facts of *Weber & Rose* are similar to those at bar. An individual who was injured on the premises of N.K.C. Hospital, Inc. ("NKC"), filed a negligence action against NKC. The jury returned a verdict of $2,900,000. NKC was self-insured for the first $2,000,000; but its excess insurer, American Continental

Insurance Company ("ACIC"), refused to satisfy the remainder of the judgment and filed suit, seeking a declaration that there was no coverage under its policy. Weber & Rose, the law firm which had represented NKC in the underlying tort action, intervened in the subsequent action seeking a declaration that it could not be liable to ACIC for malpractice. ACIC then filed a cross-claim against Weber & Rose, alleging that the firm had committed malpractice.

The trial court granted summary judgment in favor of Weber & Rose and dismissed ACIC's cross-claim. The Kentucky Court of Appeals affirmed. Though it acknowledged "that some courts permit excess insurers to proceed against primary insurers for negligence and bad faith," the Kentucky Court of Appeals was "not persuaded that Kentucky should adopt such a course." *Id.* at 13. The opinion focused on the courts' "duty to protect and preserve th[e attorney-client] relationship for the benefit of the general public" when it held that "ACIC was not entitled to maintain an action for malpractice against Weber & Rose based upon a theory that ACIC was subrogated to NKC's right to maintain such an action." *Id.*

The *Weber & Rose* opinion is the strongest indicator of how the Kentucky courts would rule in the case at bar. In fact, the *Weber & Rose* court cited two cases relied upon by National Surety in its brief. *See Hartford Accident and Indemnity Co. v. Michigan Mutual Ins. Co.*, 463 N.E.2d 608 (1984) and *Ranger Ins. Co. v. Travelers Indemnity Co.*, 389 So.2d 272 (Fla.App. 1980). Despite the fact that these cases recognize an excess insurer's claim against a primary insurer based upon a theory of equitable subrogation, the Kentucky Court of Appeals adopted an alternative approach.

We predict that the Kentucky courts would apply the same analysis to the situation at bar. The *Weber & Rose* court reasoned that recognizing the cause of action would, *inter alia*, "encourage excess insurers to sue defense attorneys for malpractice whenever they are disgruntled by having to pay within the limits of policies to which they contracted and for which they received premiums." *Id*. at 14

(quoting *American Employers' Ins. Co. v. Medical Protective Co.*, 419 N.W.2d 447 (Mich.App. 1987)).[1] Similarly, recognizing the instant causes of action for breach of contract and bad faith, under a theory of equitable subrogation, would encourage excess insurers to sue primary carriers "whenever they are disgruntled by having to pay within the limits of policies to which they contracted and for which they received premiums." *Id*.

Both situations threaten the integrity of the settlement process by allowing the excess carriers, who were not involved in those underlying negotiations, to second-guess the judgment of the primary insurer's representatives. Allowing excess carriers to sue counsel for the primary would suggest that counsel owed a duty to represent, not only its client, but a third party. The Kentucky Court of Appeals rejected such an outcome in *Weber & Rose*. It follows that Kentucky would not recognize a cause of action that expands the duty owed by the primary insurer to, not only its insured, but a third party, particularly when that third party has been paid under a contract for assuming the risk of an excess judgment.

National Surety informs the court that a "majority of jurisdictions allows an excess carrier to sue a primary based on the equitable subrogation doctrine." Defendant's Brief (DN 13), p. 13. An examination of the opinions from these jurisdictions reveals that this "majority rule" is motivated by certain policy-driven concerns. The courts acknowledge that, in recognizing a cause of action under the doctrine of equitable subrogation, they are creating a remedy in favor of excess insurers.[2] We

---

[1] While the *American Employers* court refused to allow an excess insurer to sue the primary insurer's attorney via equitable subrogation, the Michigan state courts have permitted an excess carrier to sue a primary insurer for bad faith failure to defend or failure to settle within policy limits. *See Commercial Union Ins. Co. v. Medical Protective Co.*, 393 N.W.2d 479 (Mich. 1986). We reject such a distinction, however, and find the rationale from *American Employers* persuasive in our determination that the Kentucky courts would refuse to recognize the instant cause of action against Hartford.

[2] *See, e.g.*, COUCH ON INSURANCE 3D 222:18 ("The underlying rationale for applying the doctrine of equitable subrogation in favor of excess liability insurers, and against primary liability insurers, is because the excess insurer, rather than the insured, bears the cost of the verdict or settlement in excess of the amount of the primary insurance policy when the insured had excess insurance"); *Employers National Ins. Corp. v. General Accident Ins. Co.*, 857 F.Supp. 549, 551 (S.D. Tex. 1994) ("Without this remedy, the primary insurer would have no incentive –

decline to fashion a remedy for what we perceive as a nonexistent injury. The excess insurers, who have received premiums in exchange for assuming the risk of an excess judgment, have suffered no wrong for which we can justify creating a remedy out of whole cloth. Furthermore, there are "no shoes" for National Surety "to step into" because Sufix, who has been fully indemnified, has suffered no loss. *See also Federal In. Co. v. Travelers Casualty & Surety Co.*, 843 So.2d 140, 144 (Ala. 2002) ("it is also well-settled that a bad-faith-failure-to-settle claim does not exist where the insured is subject to no personal loss from a final judgment").

Our position may best be illustrated by examining the hypothetical situations which have motivated the other jurisdictions to adopt an alternate approach. For instance, in *Employers National Ins. Corp. v. General Accident Ins. Co.*, 857 F.Supp. 549, 551 (S.D. Tex. 1994), the court stated:

> [I]f an insurer with a policy limit of $1,000,000 believes that there is only a five percent chance that it will win at trial, it might refuse a settlement offer of $950,000 because it would at most be risking $50,000 if a jury found for the plaintiff, even if the verdict was $5,000,000. Because it is the insured's or an excess carrier's money that is at risk above the primary policy's limits, the primary carrier must have a duty to handle the claim with the insured's best interest in mind as well as its own. The least duty would be the level of care one would exercise if the whole liability were for the account of one party.

*Id.* at 552. This example fails to take into consideration the practical realities facing an insurer during the litigation process. An insurer who has estimated its success potential at trial to be a mere five percent is unlikely to willingly incur the substantial transaction costs of litigation involved in defending a lawsuit it is almost certain to lose.

---

other than spontaneous integrity – to work to settle within the limits of the primary policy when it is reasonably clear that the primary level will be consumed . . ."); *Twin City Fire Ins. Co. v. Country Mutual Ins. Co.*, 23 F.3d 1175, 1179 (7th Cir. 1994) ("Were it not for [the duty of good faith], a duty fairly implied in the insurance contract, in a case in which a claim could be settled at or near the policy limit, yet there was a good although not certain chance that it could be beaten at trial, the insurance company would be sorely tempted to take the case to trial.").

5

The Seventh Circuit Court of Appeals also justified its adoption of the "majority approach" by way of an economic hypothetical. *See Twin City Fire Ins. Co. v. Country Mutual Ins. Co.*, 23 F.3d 1175, 1179 (7th Cir. 1994):

> Suppose the claim was for $2 million, the policy limit was $1 million, the plaintiff was willing to settle for this amount, but the defendant's insurer believed that if the case was tried the plaintiff would have a 50 percent chance of winning $2 million and a 50 percent chance of losing. The insure's incentive would be to refuse to settle, since if it lost the trial it would be no worse off than if it settled – in either case it would have to pay $1 million – but if it won it would have saved itself $1 million. It is in order to quench this type of temptation that the liability insurer's duty to settle in good faith was read into liability insurance contracts. When by virtue of an excess insurance policy, the victim of the behavior that we have described is the excess insurer rather than the insured, the former is permitted to step into the shoes of the latter and assert the latter's implied contractual right against the misbehaving insurer.

*Id.* at 1179. Under this hypothetical, the cost of the insurer's economic risk is $500,000, since it has a policy limit of $1,000,000 and a 50% chance of winning a defense verdict. The opinion correctly recognizes that because of the liability insurer's duty to settle in good faith, which is read into its insurance contract with the insured, the liability insurer is not permitted to act only in accordance with its own economic best interests, but must act in accordance with its duty to protect the insured from an excess judgment. *See id.* Of course, the insurer has received a premium which would be generally based, *inter alia*, on the recognition that the insurer would, on occasion, have to pay more than the cost of its own economic risk by reason of the good faith duty to settle.

But where the hypothetical goes astray is when it observes that where there is excess insurance, the excess carrier is the "victim" if the primary insurer is only willing to pay the cost of its own selfish economic risk; that is, $500,000. *See id.* In fact, there is no "victim," because if there is excess insurance, the excess carrier is situated in exactly the same position as the primary carrier, and has received a premium for assuming such position. The difference is that the primary insurer has no contractual relationship with the excess insurer, and owes it no duty of good faith, contractually or otherwise. Where the excess insurer has charged and received a premium for assuming its position, it

6

is not entitled to good faith treatment by the primary insurer because it is a stranger to the contractual relationship between the primary carrier and the insured.

A return to the hypothetical illustrates the situation. Assuming there is excess insurance covering the full amount of the $2,000,000 claim, then the primary insurer and the excess insurer each face the possibility of paying $1,000,000 and a 50% chance of paying nothing. Each faces a claim with an economic risk cost of $500,000. Each owes a good faith duty to its insured to settle within policy limits. Under such a scenario, the primary carrier will pay the cost of its economic risk ($500,000) and the excess carrier will pay the cost of its economic risk ($500,000); and the $1,000,000 settlement demand will be achieved. Moreover, equilibrium will result because each insurer will have paid the economic price of its own individualized risk.

The problem with the result reached in *the Twin City Fire Ins. Co.* opinion is that, by judicial fiat, the cost of the excess carrier's economic risk is shifted to the primary carrier as if the insured had no excess insurance, as if the primary carrier owed to the excess carrier a good faith duty to settle, and as if the excess carrier had not received a premium for the risk it assumed in providing excess insurance. This results in the primary insurance carrier paying the cost of the excess insurance carrier's economic risk, not as a result of any contractual obligation, but because of judicial imposition.

In fact, the opinion in *Twin City Fire Ins. Co.* recognizes that the harm of an excess verdict to an insured with no excess coverage is considerably different from the harm to an excess insurer whose business it is to cover such a risk. *See id.* But the opinion proposes that the excess insurer is nonetheless "hurt" because if the primary insurer refuses to pay the $1,000,000 in settlement, its actions would convert a zero probability of liability to the excess insurer into a 50% probability that the excess insurer would lose $1,000,000. *See id.*

Of course, it is certainly correct that if the primary insurer pays the cost of the excess carrier's economic risk ($500,000), in addition to its own $500,000 risk, the case can be settled for $1,000,000

7

and the excess insurer will pay nothing. So the real question devolves into whether the excess insurer is entitled to "a zero probability of liability" under circumstances where it has sold its insured an excess policy, received premiums for the policy, and is fully able to settle its own risk exposure in the same manner that the primary insurance carrier can settle its risk exposure.

The bottom line here is that there is no economic rationale for favoring the excess carrier at the expense of the primary carrier by forcing the latter to purchase the former's economic risk. *Twin City Fire Ins. Co.*, and other cases along the same line, simply permit an excess carrier to step into the shoes, not of its insured, but into the shoes of an imaginary insured who had no excess insurance. Such a result has no basis in reality, and artificially allocates costs.

The courts subscribing to this view apparently feel compelled to fashion a remedy for excess carriers when primary carriers "expose" them to risk,[3] because such a remedy would "serve the public interest." *See Employers National*, 857 F.Supp. at 552. Specifically, several courts have expressed concern that excess insurers may raise premiums if courts do not recognize the excess carrier's right to subrogation. *See, e.g., Peter v. Travelers Ins. Co.*, 375 F.Supp. 1347, 1350-51 (C.D. Cal. 1974) ("If the primary carrier is relieved of its duty to accept reasonable offers by the existence of excess insurers, it would put an additional financial liability on the excess carrier which would be reflected in increased premiums."); *Employers National*, 857 F.Supp. at 552 ("[U]nreasonable economic behavior by the primary carrier results in economic waste through increased costs for the same protection, unproductively raising premiums for excess insurance.").

Applying the same logic, if we were to recognize the instant causes of action via equitable subrogation, it is just as likely that the *primary insurer* would raise its premiums because it would face assuming and paying the cost of an excess insurer's economic risk. While there might also be a

---

[3] We note that this is a risk "to which they contracted and for which they received premiums." *Weber & Rose,* 997 S.W.2d at 14.

8

corresponding decrease in excess insurance premiums, the increasing cost of primary insurance would nonetheless be passed on to the many insureds who do not have excess coverage. It is not within the province of the courts to determine which parties would best bear these types of burdens. Rather, the costs are best allocated via the marketplace, in accord with fairly distributed risks.

Many courts have also concluded that recognizing equitable subrogation in this context comports with the idea that reasonable settlements should be favored. *See, e.g., Employers National*, 857 F.Supp. at 552. We note, however, that it remains questionable whether pressuring primary insurers to settle for policy limits and bear the cost of economic risk which is properly that of another, differently situated, carrier furthers the goal of achieving reasonable settlement. We also fail to see how the above hypotheticals "distribute losses between the primary and excess segments of the insurance policy according to the additional cost the particular segment causes by its own choice of behavior." *Id.* In fact, encouraging the primary insurer to settle for its policy limits and assume the cost of the excess carrier's economic risk or, in the alternative, end up reimbursing the excess carrier for payment of the excess judgment, actually distributes the costs unfairly.

### B. Conventional Subrogation

National Surety plead its breach of contract claims on alternative bases: conventional and equitable subrogation. *See* Complaint, ¶¶ 21, 25. Conventional subrogation is "founded upon contract or agreement, as distinguished from 'legal' [or equitable] subrogation, which is founded on equitable principles of restitution and unjust enrichment." *Dodson v. Key*, 508 S.W.2d 586, 589 (Ky. App. 1974). National Surety maintains that even if the court dismisses the equitable claims, its conventional claims may survive. We disagree.

The language relied upon by National Surety is contained in its insurance contract with Sufix: "If any insured has rights to recover all or part of any payment, [National Surety] make[s] under this policy, those rights are transferred to [National Surety]." Plaintiff's Exhibit A, p. 15, ¶ Q.1. Sufix's

9

purported right to recover payment is predicated on a theory that Hartford breached its contract with Sufix by failing to perform an adequate investigation, provide competent defense and settle within policy limits. However, Sufix sustained no injury as a result of Hartford's handling of the claim and failure to settle within its policy limits. Sufix stands fully indemnified. Hartford paid the limits of its policy and National Surety fulfilled its contractual obligation to satisfy the excess judgment. Sufix made no payment. Under the terms of the insurance contract itself, therefore, National Surety has no right to subrogation because its insured has suffered no injury and has no claim.

For the reasons stated above, we reject the rationale of those courts which permit an excess carrier to pursue subrogation against a primary carrier by allowing the excess carrier to step into the shoes, not of its insured, but of an imaginary insured who was bereft of excess insurance. We predict that the Kentucky courts would agree. Accordingly, we will grant the defendant's motion to dismiss all claims in this case. A separate order will be entered herein this date in accordance with this opinion.

cc: Counsel of Record